This suit for damages for personal injuries results from a very serious automobile accident in which two persons were killed, two others — one of them the plaintiff in this suit — sustained serious injuries and a Ford automobile was practically demolished, and a large truck was damaged. The time was about 1 o'clock in the very early morning of January 1, 1943, and the scene was about a mile west of Paradis, La., on U.S. Highway No. 90, which runs from New Orleans through Houma, La., towards the west. The truck, owned and operated by Rosario Tramontana, was standing at the time on, or partially on, the paved portion of the highway, facing towards New Orleans and the Ford, also on its way towards New Orleans, was being driven by Lloyd Detillier, its owner. In the Ford, on the front seat with Detillier, was Ivy Rodriguez and on the rear seat were the present plaintiff, Duet, and Arthur Langley.
The paved portion of the highway at that point is about 20 feet wide and in its center there is a broad, black line which divides it into two lanes of approximately 10 feet each, one for use of traffic going in each direction. On the south side of the paved portion of the highway, which is the right-hand side as these two vehicles were going, there is a broad shoulder which is not paved.
Tramontana conducts a vegetable business in New Orleans and in nearby towns, buying vegetables at wholesale in New Orleans and selling them directly from his truck. He had spent the previous day in Houma, La., and was on his way back to New Orleans.
After passing Des Allemands, which is about five miles from the point at which the accident occurred, he began to experience motor trouble. He "nursed" his motor along for a very short distance, but when it completely failed, he says that he turned it towards the side of the highway in order to leave the paved portion and to let it come to a halt on the shoulder. It did not reach the shoulder, however, and he says that he alighted and attempted to push it completely off the paved portion, but that when the two front wheels and the right rear wheel had reached the shoulder, he was not strong enough to push it any further and it came to a permanent rest, with its left rear wheel still on the paved portion.
Tramontana says too, and this is one of the most bitterly contested questions in the case, that even before attempting to move the truck from the highway, he lit and placed on the highway three flares as required by the Louisiana Highway Regulatory Law
There was a very heavy fog at that point and, consequently, the visibility was extremely bad. Tramontana says too that he then took a hand flashlight and walked a short distance back of his truck for the purpose of attempting to stop any other vehicles which might be approaching so that he might obtain the help of the driver of any one of them.
Shortly after his truck came to a stop, the Ford in which plaintiff was a passenger, crashed into its rear and knocked it a short distance forward and partially into a ditch alongside the shoulder of the road. The Ford itself also crossed the shoulder and stopped only when it too had reached the ditch.
Very shortly after this occurrence, there arrived upon the scene a tank truck of Southport Petroleum Company operated by its employee, Dudley J. Meaux. This truck, also going towards New Orleans, was brought to a stop by Meaux, who alighted to investigate and give assistance. *Page 326 
Four suits for damages have resulted and while the four were not consolidated for trial it was stipulated that the evidence submitted in this suit might be used so far as relevant in each of the others, with such supplementary evidence as might be available.
Plaintiff, Duet, has sued Tramontana and Metropolitan Casualty Insurance Company of New York, the liability insurance carrier of Tramontana and, from a judgment dismissing his suit, he has appealed.
The principal charges of negligence are as follows: (1) that in leaving his truck, partially on the paved portion of the highway without a clearance of 15 feet to its left, Tramontana violated Section 3, Rule 15 of Act No. 286 of 1938 (the Louisiana Highway Regulatory Act) and, (2) that he also violated Section 1 of Act No. 164 of 1936 in that he left his truck on the highway with no lights, no flares, flags or other signals.
Defendants aver that the truck was not "parked" on the highway but was disabled there and that the flares were placed as required by law, that the lights of the truck were burning and that Tramontana, with the use of a flashlight, did all that he could to prevent other motorists from driving into it; and, as an alternative defense, defendants aver that the true or proximate cause of the accident was negligence of the driver of the Ford in which plaintiff was a passenger in operating that car at a high rate of speed, in a dense fog.
While it is conceded by defendants that ordinarily the negligence of the driver of an automobile is not to be imputed to a passenger in the car, it is charged that the driver of this Ford, to the knowledge of the passenger (plaintiff) had been indulging in the drinking of intoxicating liquors and, obviously, was not in a proper condition to drive with safety. It is further charged that the said driver, for sometime, had been operating the car at such speed as should have caused protest by the said passenger who, in riding with a driver in such condition and in failing to protest, evidenced contributory negligence on his own account to such an accident as to prevent recovery even if it should appear that Tramontana was guilty of any negligence which is denied.
We first consider the charges of negligence against Tramontana. It is said that he "parked" his truck on the highway without leaving a clear space of 15 feet as required by par. (a), Rule 15, Sec. 3, Title II of Act No. 286 of 1938 which, in part, reads as follows: "* * * in no event shall any person park or leave standing any vehicle, whether attended or unattended, upon any highway unless a clear and unobstructed width of not less than fifteen (15) feet upon the main traveled portion of said highway opposite such standing vehicle shall be left free passage of other vehicles thereon, * * *."
According to Tramontana, after his truck came to a stop and after he had pushed it as far as he could off the paved portion of the highway, the left rear wheel was still about one foot from the center line. The mathematical result is that since the paved part of the highway is 20 feet wide, and since the black line divides it into two lanes of equal width, there was a clear space of only about 11 feet between the rear of the truck and the other edge. But there is nothing in the record which serves to disprove the statement of Tramontana that he had not voluntarily "parked" the truck in that position but had left it there only because it unexpectedly became disabled and could not be moved further.
Paragraph (c) of Rule 15 of the above referred to highway regulatory act reads as follows: "(c) The provisions of this rule shall not apply to the driver of any vehicle which is disabled while on the paved or improved or main traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such vehicle in such position; provided, it shall be the duty of the owner or driver of any such vehicle to remove the same as soon as possible and until removed to protect traffic from same at his responsibility."
[1] We have had occasion to refer to the legal effect of such a situation, as have many other courts, and it is now well settled that where an automobile, without negligence *Page 327 
of any kind, suddenly and unexpectedly becomes disabled, and cannot be removed from the highway, the operator who leaves it on the highway is not in violation of the statute and is not guilty of negligence, provided, of course, he does all that is required of him by the dictates of prudence or by the written words of appicable statutes, to obviate, so far as possible, the obvious danger which has come into existence by the mere presence of the stationary vehicle on the highway.
Thus, in Beach v. Union Brewing Corporation et al., 187 So. 332, 336, we said: "Furthermore, the legal requirement that 15 feet be left under all circumstances has no application to vehicles disabled in emergencies. The statute itself, in rule 15 (c) provides that it shall not apply to a vehicle which is disabled 'to such an extent that it is impossible to avoid stopping and temporarily leaving such vehicle in such position.' "
In McCook v. Rebecca-Fabacher, Inc., 10 So.2d 512, 514, the Court of Appeal for the First Circuit had this to say on the subject: "Whilst it is a violation of the law (Subsec. (a), Rule 15 under Section 3 of Act No. 286 of 1938) to leave a vehicle parked or standing upon the paved or main traveled portion of the highway, it is to be noted that the section contains the qualifying phrase 'when it is practicable to park or leave such vehicle standing off of the paved or improved or main traveled portion of such highway.' (Italics ours.) After all, this qualifying provision seems to follow what is the general law on the subject, for in Babbitt's Motor Vehicle Law, p. 496, sec. 679, we find that statutes which prohibit such parking 'do not apply to disabled vehicles, if they are so disabled as to make it impracticable or impossible to drive them on the paved portion.' * * * "
Let us see then what Tramontana did to comply with other requirements of statutory law and with the dictates of common prudence. He says that among other precautionary measures he turned on his hand flashlight and used it to signal to any passing cars; that one motorist paid no attention to his signal and drove on by, passing in safety but that when he then attempted to signal to those in the Ford, in which plaintiff was riding, they too paid no attention to him but crashed into his truck. He also says that Meaux, however, the driver of the tank truck, noticed his signal and came to a stop. Meaux corroborated this and says that Tramontana was flashing the light at him as he approached. The already quoted paragraph of the Act of 1938 requires that in such a situation the person who parks or leaves an automobile on the highway "shall display appropriate signal lights thereon, sufficient to warn approaching traffic * * *." Tramontana says that the lights on his truck were burning, that there was a taillight on the left side of the rear end and that there were headlights as well as two "clearance" lights on the left side of the truck.
We find practically no contradiction of these statements. Of the four men who were in the Ford, two were killed; Langley was not placed on the stand as a witness and the fourth, the present plaintiff, Duet, says that he glanced up just as the Ford hit the truck and that there were "no lights to attract the attention of anybody." However, Duet had alleged in his petition and attempted to prove that he was asleep at the time, and therefore knew nothing about the accident — so that we reiterate that the only reliable testimony on the subject of lights on the truck at the time of the accident is the testimony of Tramontana, himself. Two State highway patrolmen who arrived at the scene between a half hour and an hour after the accident, both testify on the subject and state that there were lights burning on the truck when they got there.
E.H. Hoefeldt, one of these patrolmen, says: " * * * On the truck there were two (2) dim headlights, and one clearance light — the forward clearance light." He said that the rear clearance light "had been broken" and that "the tail-light was broken." It is obvious that these two lights were broken when the Ford crashed into the rear of the truck. The other patrolman, Walter Thompson, who went to the scene with Hoefeldt, said: "As well as I remember, the back clearance light was *Page 328 
knocked off or in, and the front clearance light was burning." And he said too that "the tail-light was broken." So we repeat that the only reliable testimony on the subject of lights shows that the lights which were on the truck were burning at the time of the accident.
We come now to the paramount factual issue which is presented: Were there flares placed in accordance with the requirements of Section 1 of Act No. 164 of 1936? This statute provides that whenever the operator of a motor vehicle shall bring such vehicle to a stop upon the paved portion of any highway, or immediately adjacent to the traveled portion of any highway "at any time during the period of from one-half hour after sunset to one-half hour before sunrise" he shall "place one lighted flare at the side of such vehicle just inside the black line marking the center of paved highways and near the center of dirt or gravel highways; place one lighted flare approximately one hundred feet to the front of such vehicle and place one lighted flare approximately one hundred feet to the rear of such vehicle; and shall maintain such lighted flares in such position during the time said vehicle remains parked. * * * "
Tramontana says that as soon as his truck came to a stop he placed his three flares. He testified as follows: " * * * I took one light out and lit it right away and put it in back of the truck about the distance of ninety (90) or a hundred (100) feet; then I came back and light and put it right in front of the truck, at about the same distance. When I did that, I came back again and got the third light and lit it and placed it in the center of my truck on the black line. * * * "
The only eyewitness who was there at the time and who, to any extent contradicts Tramontana, is Duet, the plaintiff, who says that just as he glanced up the Ford hit the truck and that there were no flares.
Before we discuss the testimony of the other witnesses let us consider two contentions made by counsel for plaintiff concerning these flares. One is that the action of Tramontana, himself, in using his flashlight to warn motorists indicates that he had not placed the flares. Counsel in his brief asks " * * * If the flares were out, as Mr. Tramontana stated, what earthly reason would there have been for him to use a flashlight at a point beyond the rear flare, to stop oncoming traffic?" Tramontana, himself, answered this question by testifying that it was his purpose to obtain help; that he wanted some one to help him push his truck entirely off the highway and he indicates that he realized that the ordinary motorist passing and seeing a truck stopped with flares alongside it would merely go around it and not stop and that he used the flashlight to stop some such motorist and get the necessary help.
Another argument of counsel is that if the flares were placed as Tramontana says they were, at least the one alongside the truck would have been completely knocked out of place by the collision and the one placed about 100 feet from the truck probably would have been knocked down too by the Ford as it approached. We do not see that any such conclusion is inescapable. The first flare the Ford would have reached would have been about 100 feet from the truck. It was placed not in the center of the road but at a point which would have given practically the entire width of the road as clearance for the Ford to pass it. When the Ford reached the truck, if it was on the right-hand side of the road, as we think it obviously was, it could have hit the truck, knocking them both into the ditch on the right-hand side as it did without striking that flare at all. One of the photographs and the record, we think, show that after the Ford had knocked the truck into the ditch, it did not pass to the rear of the truck but that it passed to its right for it is shown in these photographs, and is testified to by Meaux, that when the two vehicles went into the ditch to the right side of the road, the truck was nearer to New Orleans than was the Ford.
There is much other evidence concerning whether or not there were flares. When Meaux, the driver of the tank truck, arrived he stated positively that there were three flares placed near the *Page 329 
truck and he fixes the location substantially in accordance with the testimony of Tramontana. Meaux says that when he arrived, which was very shortly after the accident, he "saw the flares indicating that there was a truck parked there, but the truck was in the ditch * * * ". He says too that he was about 100 yards away when "the flares attracted my attention — the flashlight of the driver of the truck." He says he could fix the spot at which the truck had been stopped because "there were pieces of the car scattered on the highway next to the middle flare." There is not the slightest suggestion of any reason to disbelieve this witness. He had no interest whatever in the case. At the time of the trial, he had left this location and was stationed in San Diego, Cal., at the Naval. Air Station. Counsel for plaintiff are obviously much confused as to some of the testimony given by this witness. They state in their brief that when Meaux arrived at the scene "he found that no flares were there." We have just shown that as a matter of fact he positively stated that when he arrived on the scene he saw all three flares which had been placed by Tramontana.
The two state patrolmen state that when they reached the scene, which it is true was sometime after the accident, there were still flares present just where they should have been. They both testified that they could fix the original location of the truck by debris, and dirt which was on the highway; that one flare was opposite that spot and that the other two were placed just as the law required them to be placed. We find no reason for disbelieving these witnesses.
On the other hand, two witnesses, Harry Saucier and Lovance Detillier, each testifies that when he reached the scene there were no flares placed where they should have been placed to protect Tramontana's truck. Saucier says that at the time he was trying to get back home, going towards Westwego from Gibson, La., and that right above Paradis " * * * he saw a lady in front of the automobile light." He says that he did not notice any other automobile or truck; that this lady asked him whether there had been an accident. He was asked whether he had noticed anything on the highway such as flags, flares or any other markers or indicators and he answered: "I did not." His testimony shows considerable confusion and is not, to any appreciable extent, identified with this particular accident for the only automobile which he says he saw and which he says had no flares around it was "facing going towards Des Allemands." This was the opposite direction from that in which the two vehicles, which are here involved, were going.
We have given extremely careful and analytical study to the testimony of the witness Saucier because we noticed on our first examination of it that in it no reference whatever is made to the Tramontana truck by name or otherwise; yet counsel for plaintiff in their brief, concerning Saucier, say: " * * * He testified positively that he passed the Tramontana truck in its parked position on the highway while he was driving his automobile in the direction of Paradis, and that when he passed said truck, which was just a minute or so before the accident occurred, there were no flares whatsoever on the highway. * * * " Counsel also in their brief state that this witness " * * * came up before the accident. * * *." We are absolutely unable to find any statement by this witness to the effect that he reached the scene before the accident or to indicate that he "testified positively" that he passed the Tramontana truck. In fact, as we have already shown, he says that the first thing he saw was a lady "standing up crying * * * in front of the automobile." And he, himself, showed that the automobile in front of which this lady was standing was not the Tramontana truck.
If there was a lady crying because of the accident, the accident must already have taken place. How then can it be said that he "came up before the accident"? Furthermore, if there was a lady on the scene, she must have come from some other car because there was was no lady in the Ford, in Tramontana's truck or in Meaux's tank truck. There must then already have arrived at the scene three vehicles already mentioned and the vehicle in which the lady in question arrived, and vet Saucier *Page 330 
saw but one and that was not the Tramontana truck. "Did you notice any automobile or truck in the ditch?" He answered: "No, sir. I just stopped there, with this one car, and the lady asked me that." We doubt seriously that the witness, Saucier, was there at all, though we do not doubt that he did stop at sometime that evening when he saw a lady crying in front of some automobile.
The other witness who says that there were no flares present was Detillier, the father of the driver of the Ford who was killed and who is, himself, plaintiff in one of the other suits. He gave testimony which is not at all convincing and is, in fact, very confusing. He says that when he arrived, which was obviously sometime after the accident, he saw no flares except those which were "being" placed around the oil truck.
[2] In addition to the testimony of Saucier and of Lovance Detillier as to the absence of flares, counsel for plaintiff placed on the stand as a rebuttal witness, Charles A. Griffin. Griffin lived in Paradis, which was near the scene of the accident. He is a relative of Duet and a brother-in-law of Detillier. He was placed on the stand in rebuttal to overcome the effect of certain testimony of defendants tending to show that the occupants of the Ford automobile had been drinking rather heavily just before the accident. During his examination, he was asked whether, when he went to the scene of the accident, he saw "any flares on the pavement." The question was objected to "as positively not being in rebuttal." This objection was sustained and the witness was not permitted to testify. Counsel for plaintiff then stated: "We intend to establish by this witness that when he first came up to the scene of the accident, there were no flares on the pavement; * * * ". Just why it was ruled that this testimony was objectionable as not being in rebuttal we do not quite understand. It may be that the judge was of the opinion that it was merely cumulative — in other words, that it merely added to and corroborated the testimony which had already been introduced on behalf of plaintiff to show that there were no flares, and that therefore it did not tend to contradict testimony of defendants' witnesses but tended merely to corroborate what plaintiff's witnesses had already said. It may be also that he ruled it objectionable as not being in rebuttal on the ground that the witness had been put on the stand merely to rebut testimony as to the condition of the occupants of the Ford.
At any rate, if the ruling was incorrect we do not think that any serious harm was done. This witness was a relative of the two persons who were in the accident and there was other evidence already introduced to the effect that no flares had been seen, so his testimony would have added but little to what was already in the record. We do not think that the ruling was sufficiently important to justify the remanding of the case as, even had Griffin's testimony been admitted, the evidence would still very substantially preponderate in corroboration of the statements of Tramontana that he had placed the flares as required by law.
Counsel, however, vehemently argue that the testimony of the two patrolmen does not corroborate Tramontana's statement because when they arrived at the scene they saw only three flares whereas Meaux, the driver of the oil tank truck, stated that after seeing the three flares on Tramontana's truck and after stopping his own truck, he placed four flares to protect it. Counsel argue that since there would have been seven flares, had all been placed, it necessarily follows that since the patrolmen saw only three, what they saw were flares which had been placed by Meaux and not the flares to protect Tramontana's truck.
But these witnesses are very definite in their statements that the flares which they saw were plainly located where they would have been had they been placed to protect Tramontana's truck, where it came to stop before the accident.
[3] Counsel for plaintiff vehemently contend that the failure of defendants to place on the witness stand the coroner of the parish to testify that there were flares present raises the presumption that the said coroner would have testified to the contrary. They say this because Tramontana *Page 331 
had testified that after the accident, and after his truck had been knocked into the ditch, he started to pick up his flares and was told by some one he had better not pick them up because they ought to be examined by the coroner. Counsel say that if the coroner did come, the failure of defendants to produce him raises the presumption to which we have just referred. Even if it positively appeared that the coroner did come, we do not see that the presumption is any stronger against defendants than it is against plaintiff. Tramontana did not say that he, himself, had seen the coroner and that the coroner had prevented him from picking up the flares but he merely said that one of the police officers had said to him: "Don't pick them up, the coroner has to inspect the flares first." Surely from this situation there rests on the defendants no greater obligation to produce the coroner than was also placed on plaintiff.
[4, 5] We have no hesitation whatever in concluding that plaintiff is mistaken in his contention that there were no flares placed by Tramontana to protect his truck. We reach this conclusion in spite of the fact that a vehement attack is made on the credibility of Tramontana. At the opening of the trial below, he was placed on the stand for cross-examination and was asked whether or not he had previously sold certain real estate which he had owned in New Orleans, and he said that he sold a piece of real estate "a couple of years ago." He was asked whether this sale had taken place "before this accident", and he had answered: "I think so." Later his counsel made the admission that he had been mistaken in that and that the property had been sold after the accident, and, in fact, immediately after the filing of this suit. These circumstances might discredit this witness to some extent. On the other hand, he may have been merely in error in his recollection. At any rate, the judge of the District Court apparently believed him and we see no reason to disbelieve him since we find in the record such a complete corroboration of his more important testimony. We find that he had done everything possible to comply with the dictates of common prudence, and with the requirements of law, and that he was in no way at fault in connection with this accident.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.